IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
BRUNSWICK DIVISION

JAMES SPIES and DARLENE SPIES,    *
                                  *
        Plaintiffs,               *
                                  *
    v.                            *          CV 214-053
                                  *
DELOACH BROKERAGE, INC., d/b/a,   *
DELOACH SOTHERBY'S                *
INTERNATIONAL REALTY,             *
                                  *
                                  *
        Defendant.                *

------------

O R D E R

------------

Seeking to retire to the Golden Isles of Georgia, Darlene
Spies ("Spies") purchased a retirement home on St. Simons Island
after an admittedly cursory viewing of the home.[1]  Returning to
Florida to run their business, Plaintiffs rarely read or
reviewed documents that their realtor sent them.  Plaintiffs
never returned to Georgia to conduct any inspections, assuming
that their realtor would note any and all deficiencies in the
home.  Upon the discovery of erosion on their property,

---

[1] Hereinafter, any reference to "Spies" shall mean Mrs. Darlene Spies, unless
otherwise noted, as it is undisputed that her husband, Mr. James Spies, was
uninvolved in the purchase of the property at issue in this litigation.
(Doc. 18, Ex. 1 at 26-27.)

Plaintiffs now aver that their realtor, a St. Simons Island native, failed to adequately discharge his duties, arguing that he knew about the erosion on the property and that they relied on him to take care of everything for them. Plaintiffs filed suit against their realtor's brokerage company, claiming fraud, breach of contract, and violation of a state statute, while demanding punitive damages not less than $250,000.

In response, Defendant Deloach Brokerage, Inc. ("Deloach") argues that its realtor, Lawrence Delaney ("Delaney"), is an independent contractor, thus Deloach is precluded from liability for his acts. Additionally, Deloach avers that since the parties were never in a "confidential relationship," Plaintiffs' fraud, breach-of-contract, and breach-of-statute claims fail as a matter of law. In light of the undisputed facts of this case, the Court **GRANTS** Deloach's Motion for Summary Judgment (doc. 18) for the reasons set forth below.

## I.    FACTUAL BACKGROUND

Plaintiffs James and Darlene Spies are a married couple whose primary place of residence is in West Palm Beach, Florida. (Doc. 1 at 5; Doc. 18, Ex. 2 ("Spies Dep.") at 9.) Darlene Spies has been a president of her and her husband's company, Centerport, Inc., for at least the last ten years. (Spies Dep. at 9.) Aside from her position at Centerport, Inc., one of Spies' hobbies involves renovating houses. (Id. at 12, 67.) In

2

total, Spies has renovated "probably four or five" houses, including one waterfront property on Hypoluxo Island in Lantana, Florida, and one property in Lake Worth, Florida. (Id. at 12, 22.)

## I. The Spies' Prior Experience Living on the Water

Spies purchased two other homes that were "natural" to the water, but she "never had a problem living on the water." (Id. at 26.) The property located on Hypoluxo Island did not require the installation of a bulkhead because the "house was laid back very far away from the water." (Id. at 22.) Additionally, the house was situated on an area of elevated land, a fair distance away from the water, and there was riprap[2] surrounding the pool, forming a bulkhead. (Id. at 22.) Given its location on the water, the property was located in a flood zone, and Spies acknowledges that she was at least aware that flooding could happen at the home, even though the house was elevated. (Id. at 109.) The Spies' home in Lake Worth, Florida, was situated directly on the "intercoastal." (Id. at 24.) While renovating the house, Spies tore down and repaired the existing bulkhead to "secure the wall," built a new dock, and "brought in dirt to build the house higher," so that the property "sloped downward into the sea wall." (Id. at 24.)

---

[2] Spies defined riprap as "big boulders" that are used to create a bulkhead. (Id. at 22.)

## II. Spies begins looking for a Retirement Home

In early January 2012, Spies decided that it was time to purchase a retirement home. (Id. at 38.) After a discussion with a friend, Spies remembered a prior vacation on St. Simons Island, Georgia. (Id. at 38.) Shortly thereafter, Spies and a friend traveled to St. Simons Island to find a retirement home for the Spies.

On or about January 16, 2012, Spies responded to an advertisement for condominiums and called the listing agent, Delaney, a licensed Georgia realtor, to schedule an appointment to see the unit. (Id. at 42.) Delaney is a broker, which is defined as "any individual or entity issued a broker's real estate license by the Georgia Real Estate Commission pursuant to Chapter 40 of Title 43. The term 'broker' includes the broker's affiliated licensees except where the context would otherwise indicate." O.C.G.A. § 10-6A-3(2). Delaney operates as Deloach's affiliated licensee, meaning that Deloach holds Delaney's real estate license. (Doc. No. 18, Ex. 4 ("Deloach Aff.") ¶ 3.) Frank Deloach is "the broker for Deloach Brokerage, Inc." (Deloach Aff. ¶ 2.) Delaney is a member of the Georgia Association of Realtors ("GAR"), and he has access to form contracts for the sale of real estate through that organization. (Doc. 18, Ex. 3 ("Delaney Dep.") at 97-98.) Deloach does not control Delaney's salary, how many hours he

works, how he performs his work duties, or how he generates business.  (Deloach Aff. ¶ 4.)  Deloach provides "an office, phones, office supplies, and contract forms," the use of which is at Delaney's discretion.  (Id. ¶ 6.)

After speaking on the phone, Delaney met Spies and her friend in the bar at their hotel.  (Spies Dep. at 42-43.)  Spies and Delaney talked about her budget of $350,000 and her intention to purchase the home as a second home.  (Id. at 43.)  Spies did not give Delaney a laundry list of requirements for her second home; rather, she told him that she would know the perfect house when she saw it.  (Id. at 43.)  The next morning, the trio walked through the condominium unit that Spies initially thought that she wanted to purchase.  (Id. at 47.)  After determining that the unit was a poor fit due to noise issues, Delaney spent the rest of the day showing the ladies other available homes.  (Id. at 47-48; Doc. No. 29, Ex. 3 at 11-12.)

After failing to find a house that was acceptable to Spies, at the end of the day Spies retired to her hotel.  (Id. at 48.)  Spies asked Delaney to send her updates with new listings that she could review before her next trip to St. Simons Island.  (Id.)  The next morning, before Spies began the drive back to Florida, she noticed a missed call and voicemail on her cell phone.  (Id. at 49.)  Delaney left a message about the perfect

house that he wanted her to see before she returned to Florida. (Id.)

### III. The Property

On or about January 17, 2012, Spies, her friend, and Delaney visited 105 Dudley Lane, St. Simons Island, GA 31522 ("the Property"). (Id.) The Property, built in 2000, is a 2,518 square foot home that sits on .46 acres. (Doc. 18, Ex. 10 at 10.) The Property is bounded by a salt marsh to the west and Dunbar Creek to the east. (Doc. 18, Ex. 11 ("Jackson Survey") at 2.) An unfinished spa or pool, in addition to a brick patio, can be found in the backyard, while oak and cedar trees encircle the Property's outer bounds. (Id.; Doc. 18, Ex. 5 at 14.) The brick wall in the backyard does not obstruct one from walking directly from the house to the water: the water is accessible by walking through shrubbery and trees. (Jackson Survey at 2; Spies Dep., 53-54.) The property along the water's edge is large enough to support a dock, a feature that Spies wanted to find for her husband, who is an avid boater. (Doc. 18, Ex. 5 at 19; Delaney Dep. at 32.) If Spies purchased the home, Delaney told her that they would be neighbors, as he and his family live on Dunbar Lane. (Delaney Dep. at 27.)

### IV. The Tour of the Property

Spies "fell in love with" the Property when she first visited—she was "blown away with the view." (Spies Dep. at 52;

Delaney Dep. at 53.) During the thirty-to-sixty minute tour, the trio wandered outside, but they did not stay out for too long because of rain. (Spies Dep. at 52.) Instead of venturing to the property line, the trio stood on the balcony overlooking the water. (Delaney Dep. at 53; Doc. 18, Ex. 5 at 14, 19.) From the land's appearance, Spies believed that the boundaries of the Property were clearly marked. (Spies Dep. at 29.) Spies observed the vegetation, the palmettos, and the trees along the edge of the property, noting one dead, leaning tree in particular. (Id. at 53, 96; Delaney Dep. at 32.)

Spies admitted that she did not "investigate" the property she "didn't inspect it," but rather she "just glanced" at it during her tour with Delaney. (Spies Dep. at 54.) Spies noted some areas in the garage where she saw water on the ground, but she "did not think anything of it" because the area of concern "was right where a car sat." (Id. at 55-56.) As the tour of the home came to a close, Spies and Delaney began to talk about the Property in the driveway. (Id. at 74; Delaney Dep. at 56.) Spies was very excited about the house; she told Delaney that she would "consider making an offer" but she needed to speak to her husband first. (Spies Dep. at 58.)

V.   **Spies and Delaney's Conversation About Delaney's Duties**

Prior to leaving, Spies sought reassurance from Delaney, stressing to him she would be unable to return to St. Simons

Island for any inspections prior to closing on the home. (Id. at 74-75; Delaney Dep. at 56-57.) Spies specifically mentioned that she needed Delaney's help with the survey, the home inspection, the walk-through, and the sales agreement. (Spies Dep. at 75; Doc. 29 Ex. 1 ("Spies 2d Dep.") at 286-287.) Delaney assured her that he would "be more than happy to take care of all of that for her," telling her "don't worry[;] I got your back." (Spies Dep. at 74.) Although the parties discussed Spies' expectations of Delaney, they never memorialized their discussion in writing. (Id. at 98.)

### a. The Survey

During the conversation in the driveway, Delaney conveyed to Spies that a survey is not required in the State of Georgia. (Id. at 75; Delaney Dep. at 61.) Spies was "surprised" to learn that fact, but she assumed that her bank would require it to secure financing and to "protect their interest." (Spies 2d Dep. at 21.) Spies' bank offered to obtain a survey for $375, and she assumed that her bank would take care of procuring it for her. (Spies 2d Dep. at 21.) Even though she never purchased a home without first procuring a survey, she did not worry about an encroachment on her land and did not believe that it was necessary to obtain a survey at the time because the boundary lines appeared clearly marked. (Spies Dep. at 29.) Spies never followed up with the bank to determine if the survey had been

completed. (Spies 2d Dep. at 21.) Spies did not discover that the bank never obtained the survey until six months after closing on the Property. (Spies Dep. at 76.)

### b. The Home Inspection

Prior to closing, Delaney recommended, and subsequently hired, a home inspector on behalf of the Spies. (Id. at 78.) After the home inspector generated his report, Spies, with Delaney's help, accessed the report and read it in its entirety. (Spies 2d Dep. at 281.) Following her review of the report, Spies requested that the seller correct several issues prior to closing. (Spies Dep. at 101.) Even with her corrections, she still relied on Delaney's statement that "it was a very clean home". (Spies 2d Dep. at 282.) She took his word for the condition of the property due to "the trust that [they] developed in the days that [they] spent together." (Id. at 283.)

## III. The Walk-Through

During the walk-through, Spies noticed several issues with the house that she did not observe during her initial tour. (Spies Dep. at 56-58.) She noticed mold on the wall that she failed to observe earlier because "it is so dark down that stairwell," and she did not "think that's anything that [she's] ever noticed on a home before[,] so it didn't come to [her] attention." (Id. at 56.) Similarly, Spies also did not notice

9

rust stains going from the patio down to the front of the house because "[they] weren't outside long," and she explained that even "if she did come around to the bottom level [of the Property], [she] didn't look at it." (Id. at 57.) Spies also failed to notice that the garage door frame was rotting. (Id. at 111.) Although the rot was not visible to the naked eye, one could see that the garage door did not close properly because the frame was not intact. (Id.) Spies only noticed the damage because of her discovery of water damage in the garage, which caused the mold on the wall. (Id.) Finally, Spies noticed that there were rusted, malfunctioning electrical outlets located on the outside of the house. (Id.) As the Spies' realtor, Spies expected that Delaney would have noted some of these items that the home inspector clearly missed because he was her "eyes." (Id. at 129-130.)

### d. The Purchase Agreement and Closing

The sale of the Property proceeded as planned, even though Spies never returned from Florida to see it. (Spies Dep. at 94.) Although Spies originally offered $475,000 for the Property, Delaney advised her to increase her original offer by $25,000 to avoid the property being listed in the seller's bank's short-sale program. (Spies 2d Dep. at 64.) Spies agreed to the price increase, and Delaney sent her the completed paperwork reflecting the new offer of $500,000. (Spies Dep. at

132.)  When Delaney sent Spies the completed Purchase Agreement, he did not review the terms with Spies or her husband.  (Id. at 133.)  Additionally, he failed to provide the Spies with a copy of a Georgia Association of Realtors brochure entitled "Protect Yourself When Buying a Home."  (Id. at 133; Doc. 18, Ex. 10 ("Purchase Agreement") at 7.)  Pertinently, paragraph six of this brochure states, *Get a survey of the property*.  Buyers are encouraged to get surveys of the properties they are considering buying so that they know where the exact boundary lines of the properties are located.  Buyers should request that the survey identify . . . whether the property is in a flood plain."  (Doc. 1 at 9.)  Spies did not realize that she did not receive this brochure because she was "extremely busy" and she did not read the Purchase Agreement.  (Spies Dep. at 67, 133.)  Spies admits that she "probably never read" any of her prior contracts involving her other real estate transactions because "a realtor's job is to protect the buyer."  (Id. at 67.)  Even though she did not read the contract, Spies "signed it where [she] was told to" because she "trusted [Delaney]."  (Id. 66-67.)  Although Spies never told Delaney that she was not going to read the contract, she lamented the fact that Delaney did not go over the contract with her, as her prior realtors have done. (Id. at 66.)

The sellers of the property included a property disclosure statement, which Spies "mostly read," that stated: (1) the property was located in a special floodplain, (id. at 90; Doc. 18, Ex. 13 ("Seller's Property Disclosure") at 2); (2) there may be dead trees located on the property, (Spies Dep. at 91; Seller's Property Disclosure at 1); (3) there were "water leaks, accumulation or dampness within the basement crawl space," (Seller's Property Disclosure at 3); (4) there were repairs to "control water leaks," (Seller's Property Disclosure at 2); and (5) there was no soil movement, (Spies Dep. at 91; Seller's Property Disclosure at 1). Spies believes that the seller lied about some of the statements in the seller's Property Disclosure, particularly regarding the issue of the soil movement, but acknowledges that the seller would have had more knowledge of the movement of the property line than Delaney. (Spies Dep. at 92.) As part of the closing, Spies received an elevation certificate, but she does not recall if she saw it before closing. (Spies 2d Dep. at 280-281.)

## VI. Discovery of the Erosion Problem

Spies did not learn of the erosion problem on the Property until she hired a contractor to build a spa, approximately six months after completion of the sale. (Spies 2d Dep. at 206.) The contractor informed her that she had a "serious problem" on her hands because he could not install her requested spa, for

12

fear that it would be lost to erosion. (Id.) Following that conversation, Spies enlisted several surveyors to assess her property. (Id. at 191.)

There are two areas where erosion can be found on the Property: area number one and area number two. (Jackson Survey at 2.) Phillip Jackson ("Jackson") conducted a survey of the Property after Spies installed a timber bulkhead in the area along Dunbar Creek. (Doc. 18 Ex.7 at 37.) Jackson admitted that he did not have information regarding whether the land was built up and filled in, and he could not give a precise estimate as to when the erosion occurred in area number one. (Id. at 47-48.) Jackson also admitted that he did not know when the change occurred in area number one, agreeing that it could have been caused by the installation of the bulkhead or by a tropical storm. (Id. at 48.)

Alfred Amos ("Amos") completed an additional survey for Spies. Amos stated that a comparison between a survey completed in 1994 and his own indicated that the erosion in area number two occurred prior to the date of the May 25, 1994, survey. (Doc. 18, Ex. 6 at 47.) Amos noted, however, that area number one has "eroded substantially since" 1994, but he could not determine how or when the erosion occurred. (Id. at 47-48.) Significant to note is the fact that Amos conducted his survey after Spies installed the bulkhead, and he could not make any

representations as to whether or not the land would have experienced even greater erosion due to the installation of the bulkhead. (Id. at 49.) When Spies installed the bulkhead on the Property, the construction company removed vegetation "for a while back" to put tie-backs into the bank of the Property. (Spies Dep. at 150.) The construction company also told Spies that some of the trees would fall into the water as a result of that process. (Id.) Amos acknowledges that at least some erosion appears to have occurred after March 2012, with at least two-and-a-half feet of the land being eroded by November 2012. (Doc. 18, Ex. 6 at 49.)

Right around the time of her discussion with her contractor, in mid-October, Spies and a friend, Roger Chew ("Chew"), were driving in her car when her mobile phone rang. (Spies Dep. at 139.) The Bluetooth device in Spies' car and phone allowed for everyone in the car to hear the conversation. (Id.) Delaney called Spies to invite her and her husband to the festivities revolving around a PGA golf tournament. (Id.) Spies informed Delaney that she was on the island to install a bulkhead on the Property. (Id.) There was a "brief pause" before Delaney responded by asking, "Don't you remember me telling you about that erosion problem?" (Spies Dep. at 139.) Spies immediately berated Delaney exclaiming, "Did I ever come across when we met as a stupid fricking idiot . . . [?] If you

had told me about the land erosion then I would have definitely made sure we looked into it." (Id. at 140.) Delaney responded by recommending the name and telephone number of a bulkhead builder, with whom Spies immediately met to discuss installing a bulkhead on the Property. (Id. at 143.)

Spies knows about the principle of erosion, because there were bulkheads on her other waterfront properties, but it never occurred to her that erosion could occur on a tidal creek. (Spies Dep. at 95-96.) Spies admits that the erosion problem on the Property is not something that one could immediately observe merely by walking around the Property—it could only be determined by obtaining a survey and comparing it to previous surveys. (Id. at 149.) Because Delaney was "born and raised" on St. Simons Island, Spies expected Delaney to have a general knowledge about erosion due to his knowledge of St. Simons Island and the fact that he lived by Dunbar Creek for a number of years. (Id. at 149-150.) Spies admits that she could not think of any reason why Delaney would want to hurt her or run the risk of ruining their business relationship because she was unsatisfied with his service, particularly when he knew that he would stand to gain more business from her if she was pleased with his work. (Id. at 98; Spies 2d Dep. at 71.)

## II.   PROCEDURAL BACKGROUND

On or about March 24, 2014, Spies and her husband filed suit against Deloach in the Superior Court of Glynn County, Georgia, seeking punitive damages not less than $250,000 and asserting claims of fraud, breach of contract, and statutory violations. (Doc. 1.) Deloach removed the action to this Court on April 17, 2014. _Id._ Deloach moved for summary judgment on January 2, 2015. (Doc. 18.)

## III.   LEGAL STANDARD

Summary judgment is required where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it "might affect the outcome of the suit under the governing law." FindWhat Inv'r Grp. V. FindWhat.com, 658 F.3d 1282, 1307 (11th Cir. 2011) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). A dispute over such a fact is "genuine" if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." _Id._ In making this determination, the court is to view all of the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor. Johnson v. Booker T.

<u>Washington Broad. Serv., Inc.</u>, 234 F.3d 501, 507 (11th Cir. 2000).

The party seeking summary judgment bears the initial burden of demonstrating the absence of a genuine issue of material fact. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986). To satisfy this burden, the movant must show the court that there is an absence of evidence to support the nonmoving party's case. <u>Id.</u> at 325. If the moving party discharges this burden, the burden shifts to the nonmovant to go beyond the pleadings and present affirmative evidence to show that a genuine issue of fact does exist. <u>Anderson</u>, 477 U.S. at 257. The nonmovant may satisfy this burden in two ways: First, the nonmovant "may show that the record in fact contains supporting evidence, sufficient to withstand a directed verdict motion, which was 'overlooked or ignored' by the moving party, who has thus failed to meet the initial burden of showing an absence of evidence." <u>Fitzpatrick v. City of Atlanta</u>, 2 F.3d 1112, 1116 (11th Cir. 1993) (quoting <u>Celotex</u>, 477 U.S. at 332 (Brennan, J., dissenting)). Second, the nonmovant "may come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency." <u>Id.</u> at 1117. Where the nonmovant attempts to carry this burden instead with nothing more "than a repetition of his conclusional allegations, summary

judgment for the defendants [is] not only proper but required." _Morris v. Ross_, 663 F.2d 1032, 1033-34 (11th Cir. 1981).

In this action, the Clerk of the Court gave Plaintiffs notice of the motion for summary judgment and informed them of the summary judgment rules, the right to file affidavits or other materials in opposition, and the consequences of default. (Doc. 21.) Therefore, the notice requirements of _Griffith v. Wainwright_, 772 F.2d 822, 825 (11th Cir. 1985) (per curiam), are satisfied. The time for filing materials in opposition has expired, and the motion is now ripe for consideration.

## IV.    DISCUSSION

### I.    Fraud and Violation of Statute (BRRETA) Claim Fails

The tort of fraud consists of the following five elements: "(1) a false representation or omission of a material fact; (2) scienter; (3) intention to induce the party claiming fraud to act or refrain from acting; (4) justifiable reliance; (5) damages." _Lehman v. Keller_, 677 S.E.2d 415, 417-18 (Ga. Ct. App. 2009). In the context of real estate transactions, there are three different types of fraud:

> a willful misrepresentation, i.e., the seller tells a lie; upon active concealment where the seller does not discuss the defect but takes steps to prevent its discovery by the purchaser; and thirdly a passive concealment where the seller does nothing to prevent the discovery but simply keeps quiet about a defect which[,] though not readily discernible, is known to the seller.

18

Hoffman v. Fletcher, 535 S.E.2d 849, 851 (Ga. Ct. App. 2000) (citation omitted). The parties in this case differ as to whether the actions, or inactions, in question constitute a case of passive concealment or active concealment. The Court discusses that distinction below. First, however, the Court will address the conflict regarding the nature of the relationship between Spies and Delaney, as its resolution will lead to the disposal of Spies' fraud claim, in addition to the remaining claims.

### a. The Parties Did Not Have a Confidential Relationship

A confidential relationship, by virtue of its definition, is a fiduciary relationship and courts have used the terms interchangeably. See, e.g., Harris v. Fulton-DeKalb Hosp. Auth., 255 F. Supp. 2d 1347, 1375 (N.D. Ga. 2002) (explaining that "[u]nder Georgia tort law, a fiduciary duty is established where the parties enjoy a confidential relationship"); see also Georgia Law of Torts § 33:8 (West 2014) (explaining that "[f]iduciary relationships are also synonymous with 'confidential relationships' as described in Code Section 23-2-58"). O.C.G.A. § 23-2-58 states that a relationship shall be deemed confidential "where one party is so situated as to exercise a controlling influence over the will, conduct, and

interest of another, or where, from a similar relationship of mutual confidence, the law requires the utmost good faith."

To establish a fiduciary or confidential relationship, the party asserting its existence bears the burden of establishing it. O'Neal v. Home Town Bank of Villa Rica, 514 S.E.2d 669, 675 (Ga. Ct. App. 1999). "When a fiduciary or confidential relationship is not created by law or contract, we must examine the facts of a particular case to determine if such a relationship exists." Yarbrough v. Kirkland, 548 S.E.2d 670, 673 (Ga. Ct. App. 2001). "Although the existence of a confidential relationship depends upon the circumstances and therefore is generally a jury issue," where the facts are patent, unambiguous, and undisputed, the Court may decide the issue of a confidential relationship as a matter of law. Williams v. Dressur Indus., 120 F.3d 1163, 1168 (11th Cir. 1997).

### i. A Realtor and a Client Do Not Have a Fiduciary Relationship Pursuant to the BRRETA

As an initial matter, the relationship between a realtor and a client is governed by O.C.G.A. § 10-6A, otherwise known as the Brokerage Relationships in Real Estate Transactions Act ("BRRETA"). O.C.G.A § 10-6A. Pertinently, the BRRETA clearly

defines the relationship between a broker[3] and a client,[4] or customer,[5] stating:

> A broker who performs brokerage services for a client or customer shall owe the client or customer <u>only</u> the duties and obligations set forth in this chapter, <u>unless the parties expressly agree otherwise in a writing signed by the parties</u>. A broker shall not be deemed to have a fiduciary relationship with any party or fiduciary obligation to any party but shall only be responsible for exercising reasonable care in the discharge of its specified duties as provided in this chapter and, in the case of a client, as specified in the brokerage agreement.

O.C.G.A. § 10-6A-4(a) (emphasis added). It is thus clear, pursuant to the BRRETA, that a realtor does not enjoy a fiduciary relationship with a customer—here, Spies—unless the parties agree otherwise in a signed writing.

It is undisputed that the parties never created a separate contract, in writing, expressly delineating Spies' expectations of Delaney. (Spies Dep. at 98.) The only evidence the Court has of the existence of such an agreement is Spies' assertion that Delaney told her "don't worry[;] I got your back," with

---

[3] A "broker" is defined by the BRRETA as "any individual or entity issued a broker's real estate license by the Georgia Real Estate Commission pursuant to Chapter 40 of Title 43. The term 'broker' includes the broker's affiliated licensees except where the context would otherwise indicate." O.C.G.A. § 10-6A-3(2)

[4] A "client" is defined by the BRRETA as "a person who is being represented by a real estate broker in an agency capacity pursuant to a brokerage engagement." O.C.G.A. § 10-6A-3(6).

[5] A "customer" is defined by the BRRETA as "a person who is not being represented by a real estate broker in an agency capacity pursuant to a brokerage engagement but for whom a broker may perform ministerial acts in a real estate transaction pursuant to either a verbal or written agreement." O.C.G.A. § 10-6A-3(8).

regard to coordinating the home inspection, the survey, the sale agreement, and the walk-through. (Id. at 74.) Even construing this fact in the light most favorable to Spies, without a writing, Delaney's only duties to Spies are those that are set forth in O.C.G.A. § 10-6A-14. O.C.G.A. § 10-6A-14 lists several duties "which can be performed by the transaction broker" that are relevant to this discussion. First is § 10-6A-14(a)(5), which states that a transaction broker may provide assistance by "locating architects, engineers, surveyors, inspectors, lendors, insurance agents, attorneys and other professionals." O.C.G.A. § 10-6A-14(a)(5). The second pertinent provision is § 10-6A-14(b)(3)(A), which states that a broker must:

> timely disclose the following to all buyers and tenants with whom the broker is working: (A) all adverse material facts pertaining to the physical condition located thereon including but not limited to material defects in the property, environmental contamination, and facts required by statute or regulation to be disclosed which are actually known by the broker which could not be discovered by a reasonably diligent inspection of the property by the buyer.

O.C.G.A. § 10-6A-14(b)(3)(A). Pertinently, O.C.G.A. § 10-6A-A(4) only states that a realtor must "exercise reasonable care" in the discharge of his duties.

Here, Delaney followed Spies' instructions and discharged his duties when he (1) located and hired a home inspector, (Spies Dep. at 78); (2) directed Spies' attention to the home

22

inspector's report, which she reviewed and made changes as she deemed necessary, (id. at 101); (3) informed her that a survey is not required in Georgia, (id. at 75); and (4) completed the sales contract, both initially when the offer was for $475,000, and a final time when the parties closed on the Property for $500,000 (Spies Dep. at 64). Significantly, the BRRETA clearly states that a realtor's duty is to "locate" a home inspector as part of his "ministerial acts." O.C.G.A. § 10-6A-14(a)(5). "Locating" a home inspector does not involve evaluating the home inspector's work, unless the parties signed an agreement stating otherwise. See O.C.G.A. § 10-6A-12(defining a "ministerial act" to mean "those acts described in Code Section 10-6A-14 and such other acts which do not require the exercise of the broker's or broker's affiliated licensee's professional judgment or skill"); (Spies Dep. at 98). Spies thus cannot point to any evidence in the record suggesting that Delaney did not successfully discharge his duties pursuant to the BRRETA. Accordingly, Spies' claim that Delaney violated the BRRETA fails as a matter of law.

### ii. Even Without the BRRETA, the Parties Do Not Have A Confidential Relationship

Notwithstanding the BRRETA, even assuming that the parties entered into a "relationship of mutual confidence," the undisputed facts do not merit the consideration of a jury. See

O.C.G.A. § 23-2-58. Notably, "[t]he mere fact that one reposes trust and confidence in another does not create a confidential relationship. 'In the majority of business dealings, opposite parties have trust and confidence in each other's integrity, but there is no confidential relationship by this alone.'" Lewis v. Alderman, 162 S.E.2d 440, 441 (Ga. Ct. App. 1968)(quoting Dover v. Burns, 196 S.E. 785, 786 (Ga. 1938)). On the one hand, some courts have declined to find, as a matter of law, a "confidential relationship" between business persons or even siblings. See Hancock v. Hancock, 156 S.E.2d 354, 357 (Ga. 1967)(explaining that the parties, who were brothers, did not have a confidential relationship merely by virtue of their familial ties and the facts showed that they operated at arms-length in executing the provisions of their deceased mother's will); see also Ga. Real Estate Comm'n v. Brown, 262 S.E.2d 596, 597 (Ga. Ct. App. 1979) (no confidential relationship where a real estate licensee failed to inform a lender that a check bounced when the lender could not describe the detriment of his reliance); Parello v. Maio, 494 S.E.2d 331, 333 (Ga. Ct. App. 1998) (declining to find a confidential relationship where the defendant was in charge of the plaintiff's day to day business operations for more than five years).

On the other hand, some courts have submitted the issue of a confidential relationship to a jury where it was clear that

one party operated at a disadvantage and clearly relied on the representations of the defrauding party. See, e.g., Pope v. Propst, 345 S.E.2d 880, 883 (Ga. Ct. App. 1986) (asking a jury to determine if a housing inspector, using threats of imminent condemnation, defrauded a mentally disabled woman into selling her home below fair market value); see also Bienert v. Dickerson, 624 S.E.2d 245, 249 (Ga. Ct. App. 2005)(explaining that it was a matter for the jury to determine if the broker's action of falsifying a sales agreement—which placed a lien on assets causing the business owner to expend $12,888.44 in attorney's fees to rectify the action—was a clear form of misconduct and a breach of her fiduciary duty).

In the case at hand, it is clear that a confidential relationship did not exist between Spies and Delaney. This is not a situation in which Delaney took advantage of Spies, like in Pope. 345 S.E.2d at 880. On the contrary, Spies is a sophisticated business woman who has prior experience purchasing property. (Spies Dep. at 9, 12.) Nor did Delaney use threats of imminent harm to force Spies into purchasing the Property. Cf. Pope, 345 S.E.2d at 880. The Court cannot find, nor has Spies provided evidence of, any benefit to Delaney by committing this allegedly fraudulent act. Indeed, Delaney knew that if Spies was happy, he would only stand to benefit because Spies told him that she enjoys renovating houses and she would

consider using his services again in the purchase and renovation of other homes. See Ga. Real Estate Comm'n, 262 S.E.2d at 597; (Spies 2d Dep. at 71.)

Furthermore, Spies admits that she could not think of any reason why Delaney would want to hurt her or run the risk of ruining their business relationship because she was unsatisfied with his service. (Spies Dep. at 98.) In Parello, the Court declined to find a "confidential relationship" between businessmen who worked together for more than five years. 494 S.E.2d at 333. If five years is insufficient to establish a confidential relationship, then the case at bar—in which Spies and Delaney were in each other's presence for approximately one-and-one-half days and in communication during the approximately six weeks it took to close on the house—is certainly not enough for Spies to prevail. (Spies Dep. at 47-48.) In light of the foregoing, the Court cannot find as a matter of law that Spies and Delaney entered into a confidential relationship.

### b. Since Spies Failed to Conduct Her Own Due Diligence, Her Fraud Claim Fails as a Matter of Law

Spies' claim of fraud fails as a matter of law because she cannot prove any of the elements of fraud. Spies argues that the fraud perpetrated by Delaney constitutes active concealment. Deloach argues that the matter of fraud should be dismissed on

the basis that Spies failed to conduct the due diligence required in a passive-concealment fraud case. To prove fraud under a theory of active concealment, Spies must prove that Delaney did not discuss the defect—here, the erosion—but instead took steps to prevent its discovery. Hudson v. Pollock, 598 S.E.2d 811, 814 (Ga. Ct. App. 2004).

In the case at hand, it is clear that Delaney never attempted to hide the condition of the Property. Delaney told Spies that a survey was not required in Georgia: he stated the law for her, and he did not attempt to hide the ball on this point in any way. (Spies Dep. at 75.) Spies learned that her bank would do a survey for $375, but she never followed up with the bank to determine if it had been completed and never insisted that Delaney locate a surveyor. (Spies 2d Dep. at 21.) That the Property sat on land without a bulkhead was an open and obvious condition that Delaney in no way obscured. If Spies, who is an experienced home buyer, wanted a survey of the Property, she had every right, during the inspection period, to demand whatever inspection she desired prior to closing. See Purchase Agreement at 3 (explaining that the purpose of the due diligence period is for the buyer to "conduct at buyer's sole expense whatever evaluations, inspections, appraisals, examinations, surveys, website and reviews, and testing, if any,

[b]uyer deems appropriate to determine whether [b]uyer's option to terminate th[e] [a]greement should be exercised").

Spies admitted that it was impossible, merely by observing the land, to determine that there was an issue of erosion. (Spies Dep. at 149.) Notwithstanding that fact, two professional surveyors could not determine, with certainty, how or when the erosion occurred in area number one. (Doc. 18 Ex. 6 at 48; Doc. 18 Ex 7 at 48.) Spies' expectation that Delaney should be held liable for erosion on her land that he did not own, merely because he lived down the street and had knowledge of the waterways around Dunbar Creek, when she knew that there were dead, leaning trees on the Property, strains credulity.

Passive-concealment fraud occurs "where the seller does nothing to prevent the discovery [of the issue] but simply keeps quiet about a defect which though not readily discernible, is known to the seller." Hudson, 598 S.E.2d at 814 (citation omitted). To constitute passive-concealment fraud, Spies must prove, "as a factor of justifiable reliance, that they could not have discovered the alleged defect in the exercise of due diligence." Lehman, 677 S.E.2d at 417. "While [j]ustifiable reliance, more often than not, is a jury issue, summary judgment may be appropriate if the means of ascertaining the relevant facts are equally available to all parties." Isbell v. Credit Nation Lending Serv., LLC, 735 S.E.2d 46, 54 (Ga. Ct. App. 2012)

(citing <u>Ades v. Werther</u>, 567 S.E.2d 340, 344 (Ga. Ct. App. 2002)).

> The law will not excuse [a plaintiff] for failing to read the instrument because of her confidence in the defendant, upon whom she had no legal right to rely, and who the allegations show employed no trick or artifice that caused her to fail to do her duty in reading before signing. No one can truthfully claim to have been defrauded in a matter about which that one has full knowledge and opportunity to exercise his free choice. The law will protect the innocent against fraud . . . but it demands of everyone that he make use of his own facilities to avoid being defrauded.

<u>Legacy Acad., Inc. v. Mamilove, LLC</u>, 771 S.E.2d 868, 872 (Ga. Ct. App. 2015) (citation omitted); <u>see also</u> <u>Real Estate Int'l, Inc. v. Buggay</u>, 469 S.E.2d 242, 245 (Ga. Ct. App. 1996)("The law does not afford relief to one who suffers by not using the ordinary means of information, whether the neglect is due to indifference or credulity. When the means of knowledge are at hand and equally available to both parties, and the subject of the purchase is alike open to their inspection, if the purchaser does not avail himself of these means, he will not be heard to say, in impeachment of the contract of sale, that he was deceived by the vendor's representations or lack thereof.")

As is set forth above, Spies knew that there were issues with the Property. Although Spies relied on Delaney to be her "eyes," the law imparts on everyone a duty to read. <u>Legacy</u>

Acad., Inc., 771 S.E.2d at 872; (Spies Dep. at 130.) Spies offers a myriad of excuses regarding why she did not read her contract—that she was "extremely busy" (Spies Dep. at 67), and that she expected Delaney to go through it with her (id. at 66), but there is simply no excuse for her failure to read the contract when she had ample opportunity to do so. See Legacy Acad., Inc., 771 S.E.2d at 872. Delaney did not prevent her from reading the contract in any way—in fact, when he directed her attention to the home inspector's report, she read it and she immediately made changes that she deemed necessary. See id.; (Spies Dep. at 101.) If the language of the contract confused Spies, she could have called Delaney, seeking clarification. It is clear that Spies had the savvy to read and elucidate issues when she wanted to, but she cannot renege and claim ignorance now that it suits her purposes. The law on this point is clear; the Court will not reward Spies when she could have avoided this quagmire by taking ten minutes out of her "busy" day to read. (Spies Dep. at 67.)

In light of the above, since the Court fails to find evidence of willful misconduct or fraud on Delaney's part, it would be inappropriate to grant Spies' demand for punitive damages. See Youngblood v. Mock, 238 S.E.2d 250, 252 (Ga. Ct. App. 1977). Accordingly, Spies' claim for punitive damages fails as a matter of law.

## II. The Remaining Claims Against Deloach Lack Merit

### a. Delaney is Deloach's Independent Contractor

Deloach is not liable for the tortious acts of its independent contractors. With regard to real estate brokerage firms, the law is well settled; such firms generally are

> not responsible for torts committed by [their] employees when the latter exercises an independent business, and in it is not subject to the immediate direction and control of the employer. In determining whether the relationship of parties under a contract for performance of labor is that of employer and servant or that of employer and independent contractor, the chief test lies in whether the contract gives, or the employer assumes, the right to control the time, manner, and method of executing the work as distinguished from the right merely to require certain definite results in conforming to the contract.

O'Dell v. Mahoney, 750 S.E.2d 689, 693-94 (Ga. Ct. App. 2013) (quoting Walker v. Johnson, 630 S.E.2d 70, 76-7 (Ga. Ct. App. 2006)). Although Plaintiffs argue that Defendant's reliance on O'Dell is misplaced, the fact pattern between O'Dell and the instant case are very much the same. O'Dell involved a home buyer who sued the listing agent and a brokerage company, asserting claims for negligence and misrepresentation. See id. The Court in O'Dell failed to find any misrepresentation or negligence on the part of the realtor or the brokerage company because the purchaser did not exercise due diligence in his purchase-namely, he did not demand an inspection. See id.

31

Like in <u>O'Dell</u>, this Court failed to find any misrepresentation on the part of Delaney; instead, the Court faults Spies for failing to conduct her own due diligence. Moreover, it is undisputed that Delaney: set his own hours (Deloach Aff. ¶ 4); worked on a commission basis (<u>id.</u>); exercised his personal initiative to obtain listings (<u>id.</u>); and generated his own business (<u>id.</u>) The mere fact that Delaney used Deloach's letterhead and office space is inconsequential to proving that Delaney acted as an agent since "[i]tems such as form contracts, telephones, and office supplies are either paid for by the salesperson or provided as a convenience with no requirement that they be used." <u>O'Dell</u>, 750 S.E.2d at 693–94 (quoting <u>Mark Six Realty Assocs., Inc., v. Drake Northside Realty, Inc.</u>, 463 S.E.2d 917 (Ga. Ct. App. 1995)). Given the facts, it is thus clear that Delaney operated as an independent contractor, and, as such, Deloach cannot be held responsible for his actions.

### b. Plaintiffs' Breach-of-Contract Claim Fails

Plaintiffs' breach-of-contract claim lacks merit because the basis for the argument is debunked. To prevail on a breach-of-contract claim, a plaintiff must establish: "(1) breach [;] and the (2) resultant damages (3) to the party who has the right to complain about the contract being broken." <u>Norton v. Budget Rent a Car Sys., Inc.</u>, 705 S.E.2d 305, 306 (Ga. Ct. App.

2010)(citing <u>Kuritzky v. Emory Univ.</u>, 669 S.E.2d 179, 181 (Ga. Ct. App. 2008)). Spies' breach-of-contract claim is founded on the basis that Delaney committed fraud when he actively concealed the issue of erosion, among other issues, at the Property. (Doc. 30 at 23.) As has been discussed extensively above, the undisputed facts demonstrate that Delaney did not commit fraud. Having debunked the basis for Spies' breach-of-contract claim, and recognizing that he successfully discharged his duties pursuant to the BRRETA, Spies' claim now lacks merit.

Notwithstanding the above, the Purchase Agreement was signed by Spies, her husband, and the sellers of the Property. (Purchase Agreement at 1-16.) The Purchase Agreement contains a disclaimer, which states:

> In this Agreement, the term "Broker" shall mean a licensed Georgia real estate broker or brokerage firm and, where the context would indicate, the broker's affiliated licensees. No broker in this transaction shall owe any duty to Buyer or Seller greater than what is set forth in their brokerage engagements and [BRRETA], O.C.G.A. § 10-6A-1.

(Purchase Agreement at 4, § 13A. By signing the contract, Spies provided her consent to this section. <u>See</u> <u>Cochran</u>, 489 S.E.2d at 46 ("Where one who can read signs a contract without reading it, he is bound by its terms, unless he can show that an emergency existed at the time of signing that would excuse his failure to read it, or that the opposite party misled him by an

artifice or device which prevented him from reading it, or that a fiduciary or confidential relationship existed between the parties upon which he relied in not reading the contract."). Here, the Court failed to find evidence of fraud or willful misconduct on Delaney's part, and the Court also failed to find the existence of a confidential relationship between Delaney and Spies. Accordingly, even though Spies did not read the Purchase Agreement, she is bound by the terms of the disclaimer, which limit Deloach's liability to the duties that Delaney successfully discharged pursuant to the BRRETA.

**V.    CONCLUSION**

For the reasons stated above, the Court **GRANTS** Defendant's motion for summary judgment (doc. 18). The Clerk is directed to **ENTER JUDGMENT** against Plaintiff and **CLOSE** this case.

**ORDER ENTERED** at Augusta, Georgia this 3rd day of March, 2016.

HONORABLE J. RANDAL HALL
UNITED STATES DISTRICT JUDGE
SOUTHERN DISTRICT OF GEORGIA